#28168-a-SLZ

**2017 S.D. 84**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

VALLEY POWER SYSTEMS,                    Appellant,

v.

SOUTH DAKOTA DEPARTMENT
OF REVENUE,                               Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARK BARNETT
Judge

* * * *

JUSTIN L. BELL of
May, Adam, Gerdes & Thompson, LLP
Pierre, South Dakota                     Attorneys for appellant.

STACY R. HEGGE
South Dakota Department of Revenue
Madison, South Dakota                    Attorneys for appellee.

* * * *

CONSIDERED ON BRIEFS ON
NOVEMBER 6, 2017

OPINION FILED **12/13/17**

#28168

ZINTER, Justice

[¶1.] Valley Power Systems, Inc., contracted to install new exhaust manifolds on five "mobile power units" that were used by a utility company to provide supplemental power at one of its power plants. Valley Power did not pay contractor's excise tax or use tax with respect to the transaction. Following audits of both companies, the Department of Revenue issued a certificate of assessment requiring Valley Power to pay alternate contractor's excise tax, use tax, interest, and a penalty. An administrative hearing examiner and the circuit court affirmed the assessment, and Valley Power appeals. We affirm.

*Facts and Procedural History*

[¶2.] Valley Power is an industrial-engine distributor based in California. It entered into a contract with Black Hills Power, Inc. (BHP), a utility company that operated the "Ben French" coal-fired power plant in Rapid City. Under the contract, Valley Power agreed to provide and install new exhaust manifolds with diesel oxidation catalysts on five "Electro-Motive Diesel" MP36 power units located at the Ben French plant. The purpose of the replacements was to reduce emissions and bring the power units into compliance with new federal regulations.

[¶3.] The five power units were used by BHP to generate supplemental electricity during peak-load-electrical usage. Each unit was approximately forty feet long, ten feet wide, and eleven feet high; and each unit weighed approximately 110,000 pounds. The units were located in a fenced enclosure on a gravel pad but were not bolted to the ground. Each unit was connected to a fuel source and the electrical-power-transmission grid.

[¶4.]    Valley Power installed the exhaust manifolds over the course of two months.  The contract required BHP to pay Valley Power $808,648: $496,618 for equipment and $312,030 for labor and other expenses.  Valley Power was to "obtain all necessary tax licenses and pay all sales, gross receipts, use, and any other tax imposed."  However, for reasons not material here, Valley Power did not pay any tax.  Instead, BHP paid use tax on the transaction.

[¶5.]    BHP was subsequently audited by the Department.  After reviewing the contract and related invoices, auditor Marlin Zerbel determined that the use tax remitted by BHP should be refunded.  Zerbel reasoned that the contract involved a transaction for which Valley Power should have paid both alternate contractor's excise tax on its gross receipts and use tax on the equipment used in the contract.  Consequently, the Department refunded BHP's use tax and audited Valley Power.  Following the audit, the Department issued a certificate of assessment requiring Valley Power to pay $54,404.18 ($22,560.14 in use tax, $16,172.97 in excise tax, $12,797.75 in interest, and a $3,873.32 penalty).  Valley Power objected to the assessment and requested an administrative hearing.

[¶6.]    The power units' status as fixtures was one of the central issues in the administrative hearing.  Two witnesses testified on the units' movability and permanency.  David Peterson, Valley Power's manager, testified that the power units were mobile and were designed to be moved wherever power was needed.  Zerbel countered that although he did not personally inspect the Ben French plant, BHP employees informed him that the power units were stationary.  He also stated that according to BHP's website, the units were installed in 1965.  He finally

indicated that he had frequently driven by the units for twenty years and had never seen them move.

[¶7.] The hearing examiner concluded that the power units were fixtures to realty. The hearing examiner also concluded that Valley Power's work was classified under "division c" of the Standard Industrial Classification Manual of 1987 (SIC Manual).[1] For both reasons, the hearing examiner determined that Valley Power was a "contractor" subject to alternate contractor's excise tax under SDCL 10-46B-1 and use tax under SDCL 10-46-5. The circuit court affirmed.

[¶8.] On appeal, Valley Power challenges the hearing examiner's and circuit court's conclusions that the power units were fixtures and that Valley Power's work was classified under division c of the SIC Manual. Because the fixture question is dispositive, we do not address the question regarding classification under the SIC Manual.

*Decision*

[¶9.] An agency's findings of fact are reviewed for clear error. SDCL 1-26-37; *AT & T Corp. v. S.D. Dep't of Revenue*, 2002 S.D. 25, ¶ 17, 640 N.W.2d 752, 757. Questions of law are reviewed de novo. *Martz v. Hills Materials*, 2014 S.D. 83, ¶ 14, 857 N.W.2d 413, 417. "Whether a statute imposes a tax under a given factual situation is a question of law and thus no deference is given to any conclusion reached by the Department of Revenue or the circuit court." *Paul Nelson Farm v. S.D. Dep't of Revenue*, 2014 S.D. 31, ¶ 7, 847 N.W.2d 550, 553-54.

---

1.  The examiner concluded that the work was classified as "electrical work and electrical repair at the site of construction" and "power generation equipment installation."

[¶10.] The alternate contractor's excise tax is imposed under SDCL chapter 10-46B. SDCL 10-46B-1 provides that "an excise tax [is imposed] upon the gross receipts of all prime contractors and subcontractors engaged in realty improvement contracts for those persons subject to tax under chapter . . . 10-35."[2] To be subject to the tax, the contractor's services must either be enumerated in the SIC Manual as "construction (division c)" or "entail the construction, building, installation, or repair of a fixture to realty." SDCL 10-46B-2.[3] If the entity performing the work is a "contractor" within the foregoing definitions, the contractor may also be subject to use tax under SDCL chapter 10-46. SDCL 10-46-5 provides that a "contractor or subcontractor, as defined in chapters 10-46A and 10-46B," must pay tax on the use of "tangible personal property . . . in the performance of a contract or to fulfill contract or subcontract obligations" unless sales or use tax has already been paid in this state.

[¶11.] Valley Power argues it was not subject to excise or use tax because it was not a contractor whose services involved the repair of a fixture to realty. To

---

2. It is undisputed that BHP was a power company subject to tax under SDCL chapter 10-35.

3. SDCL 10-46B-2 provides:

> Prime contractors and subcontractors subject to the tax imposed by § 10-46B-1 include without limitation those enumerated in the Standard Industrial Classification Manual of 1987 as prepared by the Statistical Policy Division of the Office of Management and Budget, Office of the President: construction (division c). If a contractor engages in services not specifically listed in division c of the Standard Industrial Classification Manual, 1987, then the services must entail the construction, building, installation, or repair of a fixture to realty before gross receipts are subject to the tax imposed by § 10-46B-1.

determine whether property is a fixture, we consider the property's: "(1) annexation to the realty; either actual or constructive; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation." *In re Tax Appeal of Logan & Assocs.*, 331 N.W.2d 281, 282 (S.D. 1983). The intent of the party is the "controlling criterion"; the "other tests derive their chief value as evidence of such intention." *Id.* at 282-83.

[¶12.]     Valley Power argues that MP36 power units[4] are not fixtures. Valley Power focuses on the general intended purposes for which the units were designed. Peterson, Valley Power's manager, provided extensive testimony at the hearing regarding the design and purpose of such power units. He testified that the power units are designed to be mobile and that each unit is completely self-contained in a metal housing with eyelets to lift the unit and move it to any location where power is needed. He explained that power companies often move these units to different locations depending on usage and the need for additional power generation. He also explained that mobile power units are generally purchased and sold separately from the real property on which they sit. Ultimately, because BHP's units were designed to be mobile, Valley Power contends they cannot be fixtures within the meaning of SDCL 10-46B-2.

[¶13.]     Whether property is a fixture is not based exclusively on the purposes for which the property was designed. The controlling criterion is the "intention of the [property owner] with regard to making the article a permanent accession to the realty." *See Logan & Assocs.*, 331 N.W.2d at 282-83. Thus, this Court has upheld

---

4.     MP stands for "mobile power."

fixture determinations despite the fact that the property was designed to be mobile. *See Rushmore Shadows, LLC v. Pennington Cty. Bd. of Equalization*, 2013 S.D. 73, ¶¶ 9, 17, 838 N.W.2d 814, 817, 819 (concluding recreational-park trailers used in a campground were part of the real property because the trailers were intended to be permanent accessions); *Brink Elec. Constr. Co. v. State, Dep't of Revenue*, 472 N.W.2d 493, 499-500 (S.D. 1991) ("Here, the equipment could be moved, but frequent movement was not contemplated unless replacement was necessary. In this sense, the installations were permanent.").

[¶14.] Valley Power, however, also contends that BHP did not intend the units to be stationary and permanent. Valley Power vigorously disputes the hearing officer's findings on how long the units had been there and whether BHP intended them to be permanent. Valley Power contends that we should review that matter de novo.

[¶15.] The hearing examiner made findings of fact on permanency and each of the *Logan* factors for evaluating whether property is a fixture. Crucial to the decision here, the hearing officer found that: the units were stationary and had been there since 1965; the units promoted the use of the realty; and BHP intended the units be permanent. Although these findings include the language in the *Logan* test, the findings are not legal conclusions concerning the fixture determination; they also do not determine the taxability of the transaction. Instead, they are factual determinations concerning the character of the property and BHP's actual use of it. Accordingly, they are findings of physical and historical fact entitled to

deference under the clearly erroneous standard of review.[5] *See* SDCL 1-26-36, -37; *see also Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 942 (Mont. 2016) (noting factual determinations concerning irrigation system's status as a fixture are reviewed for clear error and application of those facts to the law of fixtures is reviewed de novo).

[¶16.]     Applying the clearly erroneous standard, we find no error in the hearing examiner's factual findings. Although the MP36 power units may not have been designed to be stationary and permanent, there was evidence showing that historically, BHP's power units were stationary and had been there since 1965. There was also evidence supporting the hearing examiner's findings that the units promoted the use of the realty as an electric power plant and that BHP intended the units to be permanent.

[¶17.]     Considering those findings, we conclude that the power units were fixtures. *Rushmore Shadows* is an analogous case. There, a campground used fourteen recreational-park trailers as cabins for lodging. *Rushmore Shadows*, 2013 S.D. 73, ¶ 2, 838 N.W.2d at 815. The trailers were designed to be mobile: they "were built on a single chassis with wheels" and they were not physically attached to the ground. *Id.* ¶ 3. But half of the trailers were never registered as vehicles, and none of them had been moved since they were placed in the campground. *Id.*

---

5.     Valley Power requests that we give Peterson's testimony "greater weight" because he "was familiar with mobile power units in general and actually viewed the units in question." However, "we defer to the agency on the credibility of a witness who testified live because the agency is in a better position than an appellate court to evaluate the persuasiveness of witness testimony." *In re Jarman*, 2015 S.D. 8, ¶ 18, 860 N.W.2d 1, 8-9.

¶ 4. Further, each was connected to utilities. *Id.* ¶ 5. The trailers had been used for five to thirteen years for seasonal lodging. *Id.* ¶ 4.

[¶18.] We concluded that the trailers were taxable as annexations to realty under the *Logan* tests. First, despite their mobile design, the trailers had never been moved and were "constructively attached to the real estate." *Id.* ¶ 13, 838 N.W.2d at 818. We noted that "[p]roperty need not be actually attached to the real estate" and that "[c]onstructive attachment also indicates that a party intended to permanently affix the property to the real estate." *Id.* ¶ 17, 838 N.W.2d at 819. Second, the trailers were adapted to promote the use of the realty as a campground. *Id.* ¶ 14, 838 N.W.2d at 818. Third, the length of time the trailers "remained in the same location for use as places of lodging" was "a strong indication that Rushmore Shadows intended to affix the cabins to the real estate for the economic life of the trailers." *Id.* ¶ 17, 838 N.W.2d at 819.

[¶19.] This case is not legally different. Each power unit weighed 110,000 pounds; sat in a fenced enclosure where it was connected to a fuel source and the electrical transmission grid; and each would require a crane for removal. *Cf. Brink*, 472 N.W.2d at 499 (concluding that the heavy electrical equipment used in a substation, some of which were not bolted to the ground, were fixtures). There was also evidence that the power units had been installed in 1965, that they had not been moved in the last twenty years, and that a BHP employee indicated the units were stationary. Similar to the trailers in *Rushmore Shadows*, the fact that the units had remained in the same location for nearly fifty years is a strong indication that BHP intended them to be permanently annexed "to the real estate for the

economic life of the" power units. *See* 2013 S.D. 73, ¶ 17, 838 N.W.2d at 819. Finally, the evidence indicated that the units were adapted to the use and purpose for which the real estate was used as an electrical power plant.

[¶20.] We acknowledge Valley Power's point regarding the use for which the power units were designed. But intent is the controlling criterion, and "[i]ntent is 'deduced from the circumstances of a *particular* case,' with consideration given to *all the circumstances.*" *Id.* ¶ 12, 838 N.W.2d at 818 (quoting *Logan & Assocs.*, 331 N.W.2d at 283). Here, although the power units were designed to be generally mobile, BHP's actual use reflected its intention to constructively annex them to the land for purposes of providing supplemental power at its power plant. Accordingly, the Department did not err in concluding that Valley Power's services constituted a repair of a fixture to realty, thereby subjecting Valley Power to the alternate contractor's excise tax under SDCL 10-46B-2.

[¶21.] Valley Power was also subject to use tax. For the reasons just explained, Valley Power was a "contractor . . . as defined in chapters 10-46A and 10-46B." Further, there is no dispute that Valley Power used "tangible personal property [the exhaust manifolds] . . . in the performance of [its] contract." *See* SDCL 10-46-5. Accordingly, the Department did not err in concluding that Valley Power was also required to pay use tax under SDCL 10-46-5.

[¶22.] Affirmed.

[¶23.] GILBERTSON, Chief Justice, and SEVERSON, KERN, and JENSEN, Justices, concur.